**Federal Defenders OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

January 3, 2023

**BY ECF**
Honorable Edgardo Ramos
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    **United States v. Jason Blyden**
            **22 Cr. 265 (ER)**

Dear Judge Ramos:

    Jason Blyden is a 36 year-old father of two who, prior to the instant case, had no criminal record. He spent most of his adolescence and young adulthood working legitimate jobs around New York City as a janitor, while caring for the mother who raised him and supporting his two beloved children, J▮▮▮ and J▮▮▮. There is no doubt that, in his early thirties, he made a poor decision – sensing an opportunity to make more money for his family, he began working as a drug dealer. That poor decision has led to this case, as well as a pending matter in the Bronx that prompted his first visit ever to a jail, a deeply traumatizing few weeks on Rikers Island. Now, for the first time in his life, Mr. Blyden faces prison, including most importantly a lengthy period of separation from his children.

    Mr. Blyden has taken this wakeup call seriously. Since his arrest on April 7, 2022, Mr. Blyden has done well on pretrial release.[1] Though he twice tested positive for illicit substances early in his supervision, he has otherwise been drug free. More important, while on supervision he has found full-time employment as a janitor and enthusiastically partaken in mental health services at Samaritan Village. Such conduct makes clear that Mr. Blyden has already started taking the steps to resume a law abiding life, and indeed, that the instant prosecution is already having a deterrent and rehabilitative effect.

---

[1] Mr. Blyden's sole rearrest during the pendency of the case, for his matter pending in the Bronx, was for an incident that predated his conduct in the incident case. As a result, the government did not seek Mr. Blyden's detention following that arrest.

Mr. Blyden's stipulated guideline range of 87-108 months proposes an outrageous amount of prison time for someone who has no prior criminal conviction and whose offense conduct in this case is nonviolent. Moreover, as this Court is aware, this range – and the Department of Probation's tethered recommendation of 75 months – is driven by a deeply racist disparity in the Sentencing Guidelines that continues to punish crack offenses more harshly than those involving cocaine. As set forth below, much of Congress, the Sentencing Commission, the Department of Justice, and the courts have acknowledged this disparity and disavowed the guidelines that determined Mr. Blyden's sentencing range. As such, the Court should pay no deference to Mr. Blyden's guidelines, and instead focus on the sentencing factors under 18 U.S.C. § 3553(a).

Applying those factors, I ask the Court to sentence Mr. Blyden to 18 months incarceration, to run concurrent with his anticipated upcoming sentence in the state. Mr. Blyden's lack of prior criminal record, his long history of working and caring for his family, his lack of violence in this offense, his acceptance of responsibly, and his successful time on supervision, all weigh in favor of such lenience. In addition, I ask the Court to sentence Mr. Blyden to a period of supervision following his incarceration, to include ongoing mental health treatment.

## PERSONAL BACKGROUND

*Mr. Blyden's Lonely & Neglectful Upbringing*

Mr. Blyden was born in Queens in 1986 and grew up in the Bronx. He has lived his entire life in the same two-bedroom apartment he shared with his mother, Sandra Blyden. Though Mr. Blyden is the youngest of three children his parents had together, his parents' relationship ended before he was born, and he never lived with his father. Sandra raised Mr. Blyden on her own; however, she struggled with drug addiction, specifically to crack. Her addiction left her unemployed and dependent on public benefits while caring for Mr. Blyden.

As a child, Mr. Blyden sought out a relationship with his father. He recalls taking the MTA bus on his own to visit his dad's apartment and occasionally stay overnight. But Mr. Blyden's father did not reciprocate these efforts and expressed little interest in fatherhood. Mr. Blyden recalls of his efforts to be close to his dad: "I felt like I was forcing the situation." Though it was painful, Mr. Blyden eventually accepted that his father had largely rejected him. He stopped seeking his father's affection and lost contact with him in his twenties.

Meanwhile, Mr. Blyden's older siblings also expressed little interest in forming a bond with Mr. Blyden. His sister, Shamika, who was seven years older than him, left Sandra's home when she was 14 years old and moved in with Mr. Blyden's father.

His brother, Damon, who was four years older, would come and go from the apartment for weeks at a time, eventually moving out for good when he was around 16 years old. Later in life, Mr. Blyden recalls his siblings would come back to Sandra's apartment periodically when they needed places to stay. But they made no effort to care for their little brother or serve as older role models.

As a result, Mr. Blyden's dominant memory of childhood and early adolescence is being on his own in his mother's apartment. Rather than do drugs at home, Sandra routinely disappeared on drug benders, leaving Mr. Blyden alone at home and without food. Mr. Blyden recalls going days at a time without eating, often sitting in the staircase of his mother's apartment building chewing Flintstone vitamins to satiate his hunger. Eventually, every two or three days, his mother would reemerge and bring food to the house. As he got older, Sandra taught Mr. Blyden to cook and take care of himself. Despite this severe level of neglect, Mr. Blyden feels a sense of closeness with his mother, as she was the only caretaker in his life and she ultimately taught him how to survive.

When Mr. Blyden was around nine years old, Sandra developed a romantic relationship with a man named Daren Harris. She and Daren married, and he moved into Sandra's apartment. Daren also used crack, and Mr. Blyden believes he exacerbated his mother's addiction. Mr. Blyden recalls starting to see spoons and other paraphernalia around the apartment once he moved in. Daren also became physically abusive toward Sandra: Mr. Blyden recalls witnessing Daren slap, punch, and belittle his mother. Mr. Blyden wanted to intervene, but he wasn't big enough to defend her. Eventually, Sandra and Daren separated, and Daren moved out and went back to his mother's house. The marriage was brief, but left a lasting impression on Mr. Blyden, who recalls feeling an intense sense of fear and insecurity during this time that has evolved into persistent feelings of anxiety as an adult. This period also solidified Mr. Blyden's lifelong feeling that he needed to stay close to his mother so he could protect her.

Fortunately, a few years after the marriage ended, Sandra decided to get clean. She began attending groups like Narcotics Anonymous ("NA"). Mr. Blyden remembers attending Sandra's graduation ceremony at an NA meeting and being pleased to see her gaining weight. As part of getting clean, she also started working as a home health aide, among other side jobs. But despite her ability to overcome drug addiction, she struggled with depression and alcoholism, both of which prompted her to stop working after a couple of years. With his siblings largely absent, Mr. Blyden felt like he needed to provide for his mother, as the two of them were – as they had been for most of his life – largely on their own.

Desperate for money to support himself and Sandra, Mr. Blyden's attention shifted from school to working. Starting at age 14, he found paid summer jobs through New York City's Summer Youth Employment Program. Then at age 16, he worked at

| | |
|---|---:|
| Honorable Edgardo Ramos | January 3, 2023 |
| United States District Judge | Page 4 of 13 |

McDonalds during the school year, while continuing to find summer jobs through Summer Youth. Mr. Blyden soon fell behind at school, and at age 19, having still not graduated, he dropped out. He completed a job training program through AHRC NYC, where he learned key skills around janitorial services – specifically how to strip and wax floors and operate trash compactors. He then got his first "real" full-time job at Triangle Services working as a janitor. From that point forward, Mr. Blyden pursued a career in janitorial services. He worked continuously for the next decade, financially supporting himself, Sandra, and eventually his partner and children.

*Fatherhood & Sandra Blyden's Passing*

When he was around 23 years-old, Mr. Blyden met Malinda Allaway, who soon became his romantic partner. The two each shared a strong bond with their mothers and connected over the pain of watching their mothers struggle with illness. *See* **Exhibit A** (Letter of Malinda Allaway). Malinda grew to know and love Sandra, and Mr. Blyden grew to know Malinda's mother, Kenyatta. Kenyatta has since become a significant source of support for Mr. Blyden, writing a letter of support for this case and co-signing his bond. *See* **Exhibit B** (Letter of Kenyatta Meyers).

In 2012, Malinda moved into Sandra's apartment. The following year, Mr. Blyden and Malinda welcomed their first child, their son, J██████. J██████ was born early and with complications, requiring intensive care for several weeks after birth. Mr. Blyden stayed in the NICU every day, while also supporting Malinda through her recovery from an emergency C-section. *See* Exh. A & B. Mr. Blyden describes the experience of becoming a father as transcendental: "It changed everything," he said. "I was always a provider, but this took it to another level."



*Mr. Blyden as a new father, with J██████.*

Honorable Edgardo Ramos                                              January 3, 2023
United States District Judge                                         Page 5 of 13

Around the time of Justice's birth, Sandra's health started to rapidly decline. She began suffering from seizures and would occasionally pass out, causing her to fall and bump her head. Mr. Blyden was her primary caretaker, taking her to medical appointments and ensuring she took her medications. One day while J▮ was still a baby, Mr. Blyden and Malinda were home with Sandra when she started acting very odd, unable to recognize them and barricading herself in a room. Mr. Blyden called for an ambulance and Sandra was admitted to the hospital, where doctors discovered she had developed a brain tumor. Sandra never came home again; she spent the next three months in the hospital before passing away in March 2014.

The loss of his mother hit Mr. Blyden hard, as he had lived with her since birth and the two of them had cared for each other since he was a child. Her death triggered growing feelings of anxiety, as Mr. Blyden felt like he lost the main "constant" in his life. Making matters worse, Mr. Blyden's otherwise absent siblings interfered with her medical care, preventing Mr. Blyden from seeing his mother in her final weeks. Mr. Blyden has never forgiven his siblings for this intervention, and since Sandra's death, he has had virtually no contact them.

Mr. Blyden inherited Sandra's apartment, and he, Malinda, and J▮ continued living there together. In early 2017, they learned Malinda was pregnant with their second child. But one day a few months later, the family came home to discover their furniture and belongings on the street and the landlord trying to evict them for falling behind on the rent. Mr. Blyden went to court to keep the apartment and ultimately prevailed, but the stress of the eviction took a toll on his relationship with Malinda.

In December 2017, Malinda gave birth to their second child, their daughter J▮. After J▮'s birth, Mr. Blyden and Malinda ended their romantic relationship, after nearly 13 years together. Though Malinda and the children moved out, she and Mr. Blyden have remained close friends and co-parents. Malinda has supported Mr. Blyden throughout his criminal case, even expressing concern that her decision to leave the relationship contributed to him making poor decisions. *See* Exh. A. Mr. Blyden, in turn, expresses sincere respect and admiration for Malinda. "She taught me about family," he reflects, when describing their years together, while also expressing gratitude for the warmth and compassion she showed Sandra in her final years.

Despite the separation from Malinda, Mr. Blyden regularly sees his children – at minimum every weekend and at times every day, depending on whether he is working. Now that they are a little older, he enjoys telling them "Dad jokes" and taking them to kid-friendly places like Chucky Cheese, bounce houses, and the movies. He and Malinda continue to be close and actively co-parent their children, often taking them out together as a family.




*Mr. Blyden with each of his kids: J▇▇▇, when he was a baby (left) and J▇▇▇, during a recent family outing (right)*



*Mr. Blyden with Malinda, their children, J▇▇▇ and J▇▇▇, and Malinda's mother Kenyatta, on a recent outing.*

*Offense Conduct*

Mr. Blyden fully acknowledges that he made poor decisions in his early thirties by becoming in involved in drug dealing. Though he had worked regularly as a janitor for over a decade, he found the wages insufficient to stay firmly on top of his rent obligations and provide for his children in the way he wanted. Moreover, around 2019 he lost a full-time janitorial job at Elite Services in Manhattan following a dispute with a co-worker. Tired of making low wages, Mr. Blyden knew that dealing crack was a path to "fast money." Through acquaintances, he learned he could buy crack in Harlem and re-sell it in the Bronx for a profit. He gradually started selling small amounts of crack to regular customers.

Mr. Blyden is deeply remorseful for his conduct, not least because he recognizes the painful irony of having dealt the same drug that drove his mother's addiction. When asked to explain this contradiction, he acknowledges the senselessness, but explains that crack is what is familiar to him; in some ways it's "the devil he has always known." Moreover, Mr. Blyden is ashamed and devastated that he has made choices that will cause him to be separated from his children, who have come to represent his world. He has expressed eagerness to accept responsibility for his conduct and serve what sentence is coming his way, so that he can return to his children and being an active father as soon as possible.

*Mr. Blyden's Conduct on Pretrial Supervision*

Following his arrest on the instant case in April 2022, Mr. Blyden was released on pretrial supervision. But for two positive drug tests in the early weeks of his supervision, Mr. Blyden's compliance with supervision has been near perfect. He has regularly checked in with Pretrial Services and committed no new crimes. More important, he sought and obtained full time employment through MGS Cleaning Services, securing a position as a janitor at Rockefeller University in Manhattan. He has also actively partaken in mental health counseling at Samaritan Village, where he was referred by Pretrial Services.

In July 2022 Mr. Blyden was arrested during a check in at Pretrial Services and charged in Bronx Supreme Court in connection with a shooting that occurred on June 30, 2020 (before the conduct in the instant case).[2] The Bronx criminal court granted bail, but as Mr. Blyden was initially unable to afford his bail, he spent several weeks detained at Rikers Island. This experience – Mr. Blyden's first period of incarceration ever – left him deeply scarred.

---

[2] Mr. Blyden currently faces state charges based on that offense. On the advice of his state defense counsel, Mr. Blyden does not address those allegations here, other than to state that he acted in self-defense.

7

On his first day at Rikers Island, while in the intake area, Mr. Blyden saw a man wheeled past him whose skin had melted off and whose head was split open after having a hot pot thrown on him. After he and several other people in the intake area expressed horror at this scene, a correction officer made an ominous comment to the inmates getting admitted, "welcoming" them to Rikers Island and stating, "you guys are in for a treat." Later during his time at Rikers Island, Mr. Blyden witnessed a man on the phone talking to his mother on her birthday turn around only to be slashed in the eyes with a razor and blinded by another inmate. These are just the most vivid memories Mr. Blyden has of his time at Rikers Island, though he also witnessed numerous other people be jumped and stabbed.

All of this left Mr. Blyden traumatized.[3] Indeed, his Samaritan Village records from August 2022 reflect that Mr. Blyden has sought counseling to address what he witnessed on Rikers Island, stating:

> Prior to his arrest, he describes himself as being talkative, happy, and social, enjoying shopping and riding dirt bikes…. Since his release from Riker's, he feels "off" and not like himself, much more lonely and isolated, wary, not trusting of others, staying mostly in his home and not leaving… endorsing nightmares and flashbacks of his time in Rikers… losing interest in things, feeling more watchful and guarded, tense, easily on edge, and having difficulty sleeping.

*See* **Exhibit C** (Excerpted Samaritan Village Records)

When asked why his time at Rikers was so traumatizing to him, when he himself has been accused of being involved in a shooting, Mr. Blyden acknowledged the irony but explained: "I'm not a violent person, I'm more of a defensive person… I believe in the preservation of life." Mr. Blyden had already felt a need to pursue

---

[3] As the Court may be aware, 2022 has been one of the deadliest and most violent years in Rikers Island in recent history, an already notoriously violent jail that is currently the subject of a lawsuit by the Department of Justice to seize control of administering the jail. *See, e.g.,* Jan Ransom and Jonah E. Bromwich, *Tracking the Deaths in New York City's Jail System in 2022*, NY TIMES (Dec. 12, 2022) https://www.nytimes.com/article/rikers-deaths-jail.html (reporting the 19th inmate death at Rikers Island in 2022); Jonah E. Bromwich & Jan Ransom, *Chaos at Rikers Could Lead to Federal Court Control, U.S. Attorney Says*, NY TIMES (Apr. 19, 2022) available at https://www.nytimes.com/2022/04/19/nyregion/rikers-island-federal-control.html (reporting on the Department of Justice's efforts to take control of Rikers Island via receivership); Jan Ransom, Jonah E. Bromwich & Rebecca Davis O'Brien, *Inside Rikers: Dysfunction, Lawlessness and Detainees in Control*, NY TIMES (Nov. 8, 2021) available at https://www.nytimes.com/2021/10/11/nyregion/rikers-detainees-correction-officers.html (describing violence and "sheer lawlessness" at Rikers that is "difficult to fathom"). Mr. Blyden is thus not alone in his feeling of trauma associated with time on Rikers Island.

mental health treatment prior to his incarceration on Rikers, related to persistent feelings of anxiety he has felt since childhood that were exacerbated after the death of his mother. But his incarceration at Rikers has only increased his engagement with mental health counseling, while furthering his resolve to never again put himself in a position where he faces incarceration.

Despite these sincere feelings of deterrence, Mr. Blyden understands that he is likely to serve some period of incarceration in connection with this case and his pending matter in the Bronx. I understand from Mr. Blyden's state defense counsel that he is likely to enter a plea in his Bronx matter in late January 2022 to attempted gun possession and receive a sentence of two years of incarceration.

## ARGUMENT

In selecting a sentence for the instant case, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," *i.e.*, "proportionality, deterrence, incapacitation, and rehabilitation." *Id.* Here, a sentence of 18 months' incarceration, to run concurrent with Mr. Blyden's likely upcoming state sentence and followed by a period of supervision that includes mental health services, is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), because it combines meaningful punishment and deterrence with effective rehabilitation.

### A. Mr. Blyden's Stipulated Guidelines Range is Unworthy of Deference Because it Relies on an Outdated, Racist, and Near-Universally Condemned Scheme that Treats Crack Cocaine Offenses Far More Harshly Than Cocaine Offenses.

Mr. Blyden's adjusted offense level of 32 is predicated on a base offense level of 30 under USSG §2D1.1(a)(5), (c)(5), which treats a person convicted of distributing 5,000 grams of cocaine the same as a person convicted of distributing 280 grams of cocaine base.[4] This 18:1 ratio is a vestige of the barbaric 100:1 ratio that predated the 2010 Fair Sentencing Act and continues to drive unwarranted, harsh sentencing disparities between crack and powder cocaine defendants.

---

[4] To the extent it is helpful to the Court, the defense submits that, assuming a 1:1 crack/powder cocaine sentencing ratio, Mr. Blyden's base offense level would be 24 under §2D1.1(a)(5), (c)(8). With a two-point gun enhancement and a three-level reduction for acceptance of responsibility, his adjusted offense level would be 23. Alongside a Criminal History Category of I, Mr. Blyden's guidelines would therefore be 46-57 months of imprisonment.

Unlike most guidelines, §2D1.1 is based on neither empirical data nor technical expertise. Instead, it is purely a quantity-based model, divorced from science and reason. *See Spears v. United States*, 555 U.S. 261, 265-266 (2009) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack cocaine Guidelines based on a policy disagreement with those Guidelines"); *United States v. Diaz*, 11 Cr. 821 (JG) 2013 WL 3222243, at *1 (E.D.N.Y. Jan 28, 2013) (discussing the flaws in the drug guideline at length and determining to accord the high ranges it produces "very little weight"), cited with approval in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir 2013).

Since 1995, the Sentencing Commission has recommended that the disparity between crack and powder cocaine be eliminated completely. On June 22, 2021, the Department of Justice joined that call and urged Congress to eliminate the disparity and pass the "Eliminating a Quantifiably Unjust Application of the Law Act" (also known as the "EQUAL Act").[5] On September 28, 2021, the House of Representatives passed the EQUAL Act by a vote of 361 to 66, with nearly 70% of the GOP and 100% of the Democrats voting in favor of ending the crack/powder disparity.

The DOJ presented Congress with three main arguments for eliminating the crack/powder disparity. *See* DOJ Statement at 6. First, the disparity "is simply not supported by science, as there are no significant pharmacological differences between the drugs: they are two forms of the same drug, with powder readily convertible into crack cocaine." *Id*. Second, "as documented by the Sentencing Commission, the crack/powder sentencing differential is still responsible for unwarranted racial disparities in sentencing."[6] *Id*. Third, "the higher penalties for crack cocaine offenses are not necessary to achieve (and actually undermine) our law enforcement priorities." *Id*.

Of course, the EQUAL Act has not yet passed Congress. But that has not stopped courts from abandoning the 18:1 ratio in favor of equality. The growing tide of courts to resort to a 1:1 ratio in sentencing crack cocaine cases provides even more support for this Court to view the guidelines range in this case with deep skepticism.[7]

---

[5] *See* Department of Justice Statement regarding the EQUAL Act ("DOJ Statement"), available at: https://sentencing.typepad.com/files/doj-equal-act-testimony--final.pdf.

[6] For example, a 2017 Sentencing Commission report on "Demographic Differences in Sentencing" found that Black male offenders received sentences on average 19.1% longer than similarly situated white male offenders during the fiscal years 2012 through 2016.

[7] *See, e.g., United States v. Gardner*, 20 F. Supp. 3d 468 (S.D.N.Y. 2014) (applying a 1:1 ratio rather than the 18:1 ratio of crack to powder cocaine in calculating minimum sentences under Sentencing Guidelines for defendants' convictions for drug offenses involving at least 3.6 kilograms of crack cocaine, and treating the quantity of crack cocaine attributed to the defendants as if it were the equivalent quantity of powder cocaine under the Guidelines); *United States v. Whigham,* 754 F. Supp. 2d 239, 246 (D. Mass. 2010) ("I will apply a 1:1 ratio for all crack cocaine sentencings"); *United States v. Williams*, 788 F.

Honorable Edgardo Ramos                                                            January 3, 2023
United States District Judge                                                        Page 11 of 13

**A. A Sentence of 18 Months' Imprisonment Followed by a Period of Supervision Is Sufficient but Not Greater Than Necessary to Achieve the Goals of Sentencing.**

Along with the mitigating circumstances surrounding Mr. Blyden's upbringing, his lack of prior criminal convictions, his lack of violence during the instant offense, his demonstrated commitment to his family (including caring for his mother and his children), his acceptance of responsibility, and the irrationality of the stipulated guideline range, there are ample grounds for a downward variance.

First, the **nature and circumstances of this offense** are serious but not unmitigated. Mr. Blyden sold crack cocaine over numerous occasions to an undercover officer. Though the total quantity of crack he is accused of selling triggers his high guidelines, the most he ever sold in an individual transaction was 90 grams. As such, Mr. Blyden was not a large-scale drug dealer or involved in delivering or distributing large quantities of drugs; he was, rather, working as a low-level street dealer. Mr. Blyden recognizes the seriousness of the additional charges made against him – that he sold handguns to the undercover officer and participated in a shootout in June 2020 in the Bronx – which is why he has agreed to accept responsibly for his crimes in both this and his state case. Notably, however, Mr. Blyden is not accused in any case of causing physical harm to anyone.

Second, Mr. Blyden's **history and characteristics** mitigate in favor of lenience. Mr. Blyden attained the age of 35 with no criminal convictions, due primarily to the fact that he spent most of his adulthood working continuously as a janitor while supporting and caring for his mother and his children. His support network makes clear that he is responsible, loyal, and loving, and that the instant case does not reflect who he is. As Malinda explains:

---

Supp. 2d 847, 891-92 (N.D. Iowa 2011) ("I must reject the Sentencing Guidelines using the 'new' 18:1 ratio, just as I rejected the Sentencing Guidelines using the 'old' 100:1 ratio, based on a policy disagreement with those guidelines, even in "mine-run" cases, such as this one. I must do so, because I find that the 'new' 18:1 guidelines still suffer from most or all of the same injustices that plagued the 100:1 guidelines, including the failure of the Sentencing Commission to exercise its characteristic institutional role in developing the guidelines, the lack of support for most of the assumptions that crack cocaine involves greater harms than powder cocaine, the improper use of the quantity ratio as a 'proxy' for the perceived greater harms of crack cocaine, and the disparate impact of the ratio on black offenders.").

> Jason continues to be an amazing father. Our kids love him, especially our 5-year-old daughter. She's a daddy's girl and he can do no wrong in her eyes. Our 9-year-old son is aware that his dad might have to go away for a while, and it is hurting him but he understands and still loves and looks up to his dad. Jason has shown growth throughout this process, and he has stepped up and became the man I always knew he can be. I ask for some leniency on his sentencing because he is truly a great man, and his kids need him in their life.

Exh. A.

Finally, the goals of **respect for the law, deterrence, incapacitation, and rehabilitation** also support a lenient sentence, focused on returning Mr. Blyden to supervision as soon as he completes his state sentence so he can continue to engage with mental health treatment. Mr. Blyden's compliance with pretrial supervision – including finding employment, attending counseling at Samaritan Village, abstaining from using illicit substances, and committing no new offenses – makes clear that this prosecution has already promoted these sentencing goals. Indeed, as Kenyatta explains, this case has already had a profound effect on Mr. Blyden and prompted him to reevaluate his choices in life:

> Jason is very remorseful for his mistakes and this case. This whole experience has really changed him. He has accepted responsibility and wants to grow and move past this. He tells me how he wants to start his new chapter with his kids, a job, and moving out of the bad neighborhood. I respect the attentive father that he has been and still is. He is a person who knows how to strive for a better tomorrow and can humbly respect your honor's decision.

Exh. B.

## CONCLUSION

Locking up Mr. Blyden for several years primarily because he dealt crack, as Probation and the guidelines recommend, is not justice, nor can it be squared with the §3553(a) factors in light of Mr. Blyden's lack of prior criminal record, lengthy history of working and caring for his family, his lack of violence during the instant offense, and his impressive conduct on pretrial supervision. Taking all of these considerations into account, a sentence of 18 months' incarceration, to run concurrent with his anticipated upcoming state sentence, followed by a period of supervision is more than sufficient to achieve the goals of sentencing.

Honorable Edgardo Ramos  January 3, 2023
United States District Judge  Page 13 of 13

>                   Respectfully Submitted,
>
>                   _____/s/_____
>                   Hannah McCrea, Esq.
>                   Assistant Federal Defender
>                   Counsel for Jason Blyden

Cc: AUSA Patrick Moroney

**EXHIBITS**

| A | Letter of Malinda Allaway, Mr. Blyden's former partner and the other of his children |
|---|---|
| B | Letter of Kenyatta Meyers, the mother of Ms. Allaway |
| C | Excerpted Samaritan Village Records |